**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| ARNESTA L. DAVIS, | § | |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| *versus* | § | CIVIL ACTION NO. H-08-1993 |
| | § | |
| MICHAEL J. ASTRUE, Commissioner | § | |
| of the Social Security Administration, | § | |
| | § | |
| *Defendant.* | § | |

**MEMORANDUM AND ORDER**

Pending before the Court are Plaintiff Arnesta L. Davis' ("Davis") and Defendant Michael

J. Astrue's, Commissioner of the Social Security Administration (the "Commissioner"), cross-

motions for summary judgment.  Davis appeals the determination of an Administrative Law Judge

("the ALJ") that she is not entitled to receive Title II disability insurance benefits.  *See* 42 U.S.C.

§§ 416(I), 423.  Having reviewed the pending motions, the submissions of the parties, the pleadings,

the administrative record, and the applicable law, it is ordered that Davis' Motion for Summary

Judgment (Docket Entry No. 15) is granted, the Commissioner's Motion for Summary Judgment

(Docket Entry No. 16) is denied, the Commissioner's decision denying benefits is reversed, and the

case is remanded, pursuant to sentence four, to the Social Security Administration ("SSA") for

further proceedings.

**I.   *Background***

On February 28, 2005, Davis filed an application for disability insurance benefits with the

Social Security Administration ("SSA"), alleging that she had been disabled and unable to work

since February 19, 2003.  (R. 72-74, 78).  Davis alleges that she suffers from degenerative disc

disease, lower back pain, neck pain, numbness in his right leg and hand, headaches, post-traumatic stress disorder, anxiety, and depression  ( R. 49, 78).  After being denied benefits initially and on reconsideration, on June 6, 2005, Davis requested an administration hearing before the ALJ.  (R. 44, 54-68).

A hearing was held on June 15, 2007, in Houston, Texas, at which time the ALJ heard testimony from Davis and Tom King ("King"), a vocational expert ("VE").  (R. 458-491).  In a decision dated August 20, 2007, the ALJ denied Davis' application for benefits.  (R. 28-34).  On October 19, 2007, Davis requested review of the ALJ's decision by the Appeals Council of the SSA's Office of Hearings and Appeals.  (R. 9).  The Appeals Council, on April 25, 2008, denied Davis' request to review the ALJ's determination.  (R. 5-8).  This rendered the ALJ's opinion the final decision of the Commissioner.  *See Sims v. Apfel*, 530 U.S. 103, 107 (2000).  Davis filed this case on September 19, 2008, seeking judicial review of the Commissioner's denial of her claim for benefits.  *See* Docket Entry No. 1

## II.    *Analysis*

### A.    *Statutory Bases for Benefits*

Social Security disability insurance benefits are authorized by Title II of the Act and are funded by Social Security taxes.  *See* SOCIAL SECURITY ADMINISTRATION, SOCIAL SECURITY HANDBOOK, § 2100 (14th ed. 2001).  The disability insurance program provides income to individuals who are forced into involuntary, premature retirement, provided they are both *insured* and *disabled*, regardless of indigence.  A claimant for disability insurance can collect benefits for up to twelve months of disability prior to the filing of an application.  *See* 20 C.F.R. §§ 404.131, 404.315; *Ortego v. Weinberger*, 516 F.2d 1005, 1007 n.1 (5th Cir. 1975); *see also Perkins v. Chater*,

107 F.3d 1290, 1295 (7th Cir. 1997).  For purposes of Title II disability benefits, Davis remained

insured through December 31, 2006.  (R. 28).  Consequently, to be eligible for disability benefits,

Davis must prove that she was disabled prior to that date.

Applicants seeking benefits under this statutory provision must prove "disability" within the

meaning of the Act.  See 42 U.S.C. § 423(d); 20 C.F.R. § 404.1505(a).  Under Title II, disability is

defined as "the inability to engage in any substantial gainful activity by reason of any medically

determinable physical or mental impairment which can be expected to result in death or which has

lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C.

§ 423(d)(1)(A).

**B.** *__Standard of Review__*

**1.** *__Summary Judgment__*

The court may grant summary judgment under FED. R. CIV. P. 56(c) when the moving party

is entitled to judgment as a matter of law because there is no genuine issue as to any material fact.

The burden of proof, however, rests with the movant to show that there is no evidence to support the

nonmoving party's case.  If a reasonable jury could return a verdict for the nonmoving party, then

a motion for summary judgment cannot be granted because there exists a genuine issue of fact.  *See*

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

An issue of fact is "material" only if its resolution could affect the outcome of the case.  *See*

*Duplantis v. Shell Offshore, Inc.*, 948 F.2d 187, 189 (5th Cir. 1991).  When deciding whether to

grant a motion for summary judgment, the court shall draw all justifiable inferences in favor of the

nonmoving party and deny the motion if there is some evidence to support the nonmoving party's

position.  *See McAllister v. Resolution Trust Corp.*, 201 F.3d 570, 574 (5th Cir. 2000).  If there are

no issues of material fact, the court shall review any questions of law *de novo*.  *See Merritt-Campbell, Inc. v. RxP Prods., Inc.*, 164 F.3d 957, 961 (5th Cir. 1999).  Once the movant properly supports the motion, the burden shifts to the nonmoving party, who must present specific and supported material facts, of significant probative value, to preclude summary judgment.  *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986); *International Ass'n of Machinists & Aerospace Workers, AFL-CIO v. Compania Mexicana de Aviacion, S.A. de C.V.*, 199 F.3d 796, 798 (5th Cir. 2000).

### 2.  *Administrative Determination*

Judicial review of the Commissioner's denial of disability benefits is limited to whether the final decision is supported by substantial evidence on the record as a whole and whether the proper legal standards were applied to evaluate the evidence.  *See Masterson v. Barnhart*, 309 F.3d 267, 272 (5th Cir. 2002).  "Substantial evidence" means that the evidence must be enough to allow a reasonable mind to support the Commissioner's decision; it must be more than a mere scintilla and less than a preponderance.  *See Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Masterson*, 309 F.3d at 272; *Brown v. Apfel*, 192 F.3d 492, 496 (5th Cir. 1999).

When applying the substantial evidence standard on review, the court "scrutinize[s] the record to determine whether such evidence is present."  *Myers v. Apfel*, 238 F.3d 617, 619 (5th Cir. 2001) (citations omitted).  If the Commissioner's findings are supported by substantial evidence, they are conclusive and must be affirmed.  *See Watson v. Barnhart*, 288 F.3d 212, 215 (5th Cir. 2002).  Alternatively, a finding of no substantial evidence is appropriate if no credible evidentiary choices or medical findings support the decision.  *See Boyd v. Apfel*, 239 F.3d 698, 704 (5th Cir. 2001).  The court may not, however, reweigh the evidence, try the issues *de novo*, or substitute its judgment for

4

that of the Commissioner.  *See Masterson*, 309 F.3d at 272.  In short, "[c]onflicts in the evidence are

for the Commissioner and not the courts to resolve.  *Id*.

      **C.**     ***ALJ's Determination***

      An ALJ must engage in a five-step sequential inquiry to determine whether the claimant is

capable of performing "substantial gainful activity," or is, in fact, disabled:

1.     An individual who is working and engaging in substantial gainful activity will not be found disabled regardless of the medical findings.  *See* 20 C.F.R. § 404.1520(b).

2.     An individual who does not have a "severe impairment" will not be found to be disabled.  *See* 20 C.F.R. § 404.1520(c).

3.     An individual who "meets or equals a listed impairment in Appendix 1" of the regulations will be considered disabled without consideration of vocational factors.  *See* 20 C.F.R. § 404.1520(d).

4.     If an individual is capable of performing the work [she] has done in the past, a finding of "not disabled" must be made.  *See* 20 C.F.R. § 404.1520(e).

5.     If an individual's impairment precludes performance of [her] past work, then other factors, including age, education, past work experience, and residual functional capacity must be considered to determine if any work can be performed.  *See* 20 C.F.R. § 404.1520(f).

*Newton v. Apfel*, 209 F.3d 448, 453 (5th Cir. 2000); *accord Boyd*, 239 F.3d at 704-05.  The claimant

has the burden to prove disability under the first four steps.  *See Myers*, 238 F.3d at 619.  If the

claimant successfully carries this burden, the burden shifts to the Commissioner at step five to show

that other substantial gainful employment is available in the national economy, which the claimant

is capable of performing.  *See Masterson*, 309 F.3d at 272; *Greenspan v. Shalala*, 38 F.3d 232, 236

(5th Cir. 1994), *cert. denied*, 514 U.S. 1120 (1995).  If the Commissioner is able to verify that other

work exists in significant numbers in the national economy that the claimant can perform in spite

of [her] existing impairments, the burden shifts back to the claimant to prove that [she] cannot, in fact, perform the alternate work suggested. *See Boyd*, 239 F.3d at 705. A finding that a claimant is disabled or is not disabled at any point in the five-step review is conclusive and terminates the analysis. *See id*.

The mere presence of an impairment does not necessarily establish a disability. *See Anthony v. Sullivan*, 954 F.2d 289, 293 (5th Cir. 1992). An individual claiming disability benefits under the Act has the burden to prove that [she] suffers from a disability as defined by the Act. *See Newton*, 209 F.3d at 452; *Selders v. Sullivan*, 914 F.2d 614, 618 (5th Cir. 1990); *Johnson v. Bowen*, 864 F.2d 340, 343 (5th Cir. 1988); *Cook v. Heckler*, 750 F.2d 391, 393 (5th Cir. 1985). A claimant is deemed disabled under the Act only if [she] demonstrates an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." *Shave v. Apfel*, 238 F.3d 592, 594 (5th Cir. 2001); *accord Newton*, 209 F.3d at 452; *Crowley v. Apfel*, 197 F.3d 194, 197-98 (5th Cir. 1999); *Selders*, 914 F.2d at 618; *see also* 42 U.S.C. § 423(d)(1)(A). "Substantial gainful activity" is defined as work activity involving significant physical or mental abilities for pay or profit. *See Newton*, 209 F.3d at 452-53; *see also* 20 C.F.R. § 404.1572(a)-(b).

A medically determinable "physical or mental impairment" is an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques. *See Hames v. Heckler*, 707 F.2d 162, 165 (5th Cir. 1983); *see also* 42 U.S.C. § 423(d)(3). "[A]n individual is 'under a disability, only if the impairments are of such severity that [she] is not only unable to do [her] previous work but cannot,

considering [her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . .'" *Greenspan*, 38 F.3d at 236 (quoting 42 U.S.C. § 423(d)(2)(A)). This is true regardless of whether such work exists in the immediate area in which the claimant resides, whether a specific job vacancy exists, or whether the claimant would be hired if [she] applied. *See Oldham v. Schweiker*, 660 F.2d 1078, 1083 (5th Cir. 1981); *see also* 42 U.S.C. § 423(d)(2)(A).

In the case at bar, when addressing the first four steps, the ALJ determined:

1.　The claimant last met the insured status requirements of the Social Security Act on December 31, 2006.

2.　The claimant did not engage in substantial gainful activity during the period from her alleged onset date of February 19, 2003, through her date last insured of December 31, 2006 (20 C.F.R. §§ 404.1520(b) and 404.1571 et seq.).

3.　Through the date last insured, the claimant had the following severe impairments: degenerative disc disease (20 C.F.R. § 404.1520(c)).

4.　Through the date last insured, the claimant did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. §§ 404.1520(d), 404.1525 and 404.1526).

5.　After careful consideration of the entire record, the undersigned finds that, through the date last insured, the claimant had the residual functional capacity to perform the full range of light work lifting 20 pounds occasionally and 10 pounds frequently. The claimant could stand and/or walk and sit 6 hours in an 8-hour workday. The claimant should never climb ladders, ropes, scaffolds or stairs.

6.　Through the date last insured, the claimant's past relevant work as a retail sales clerk did not require the performance of work-related activities precluded by the claimant's residual functional capacity (20 C.F.R. § 404.1565). The vocational expert testified the claimant's past relevant work as a retail sales clerk was light and semiskilled and her past relevant work as a shop cleaner was heavy and unskilled.

7.      The claimant was not under a disability as defined in the Social Security Act, at any time from February 19, 2003, the alleged onset date, through December 31, 2006, the date last insured.  (20 C.F.R. § 404.1520 (f)).

(R. 30, 33-34).  Because the ALJ found that Davis could perform her past relevant work, the ALJ did not proceed to step five of the sequential evaluation.

This Court's inquiry is limited to a determination of whether there is substantial evidence in the record to support the ALJ's findings and whether the proper legal standards have been applied. *See Masterson*, 309 F.3d at 272; *Watson*, 288 F.3d at 215; *Myers*, 238 F.3d at 619; *Newton*, 209 F.3d at 452; *Greenspan*, 38 F.3d at 236; *see also* 42 U.S.C. §§ 405(g), 1383(c)(3).  To determine whether the decision to deny Davis' claim for disability benefits is supported by substantial evidence, the court weighs the following four factors:  (1) the objective medical facts; (2) the diagnoses and opinions from treating and examining physicians; (3) the plaintiff's subjective evidence of pain and disability, and any corroboration by family and neighbors; and (4) the plaintiff's age, educational background, and work history.  *See Martinez v. Chater*, 64 F.3d 172, 174 (5th Cir. 1995); *Wren v. Sullivan*, 925 F.2d 123, 126 (5th Cir. 1991) (citing *DePaepe v. Richardson*, 464 F.2d 92, 94 (5th Cir. 1972)).  Any conflicts in the evidence are to be resolved by the ALJ and not the court.  *See Newton*, 209 F.3d at 452; *Brown*, 192 F.3d at 496; *Martinez*, 64 F.3d at 174; *Selders*, 914 F.2d at 617.

**D.      _Issues Presented_**

Davis claims the ALJ erred by: (1) failing to obtain an updated medical opinion of a medical expert as to the medical equivalency of Davis' combined impairments; (2) failing to develop the case by not obtaining an updated medical expert opinion; (3) failing to give controlling weight to the opinion of Davis' treating physician; (4) rejecting the theory that Davis meets or equals Listing 1.04; (5) failing to consider the non-exertional impairment of pain and its effects on Davis' ability to

perform the full range of light work; (6) failing to provide specific findings or analysis regarding the physical or mental demands of the past relevant work Davis could perform, as required by SSR 82-62; (7) finding that Davis could perform past relevant work; (8) failing to find Davis disabled under Medical Vocational Guideline ("Grid Rule") 201.12; (9) and finding Davis' spondylosis, lumbar radiculitis, scoliosis, degenerative spur toe, arthritis, headaches, PTSD, anxiety, and depression not to be severe impairments.  *See* Docket Entry Nos. 15, 18.  The Commissioner disagrees with Davis' contentions, maintaining that the ALJ's decision is supported by substantial evidence.  *See* Docket Entry No. 16.

### E.     *Review of the ALJ's Decision*

#### 1.     *Objective Medical Evidence and Opinions of Physicians*

When assessing a claim for disability benefits, "[i]n the third step, the medical evidence of the claimant's impairment is compared to a list of impairments presumed severe enough to preclude any gainful work."  *Sullivan v. Zebley*, 493 U.S. 521, 525 (1990).  If the claimant is not actually working and his impairments match or are equivalent to one of the listed impairments, [she] is presumed to be disabled and qualifies for benefits without further inquiry.  *See id.* at 532; *see also* 20 C.F.R. § 404.1520(d).   When a claimant has multiple impairments, the Act requires the Commissioner to "consider the combined effect of all of the individual's impairments without regard to whether any such impairment, if considered separately, would be of such severity."  42 U.S.C. § 423(d)(2)(B); *see Zebley*, 493 U.S. at 536 n.16; *Loza v. Apfel*, 219 F.3d 378, 393 (5th Cir. 2000). The relevant regulations similarly provide:

> In determining whether your physical or mental impairment or impairments are of a sufficient medical severity that such impairment or impairments could be the basis of eligibility under the law, we will consider the combined effect of all of your

impairments without regard to whether any such impairment, if considered separately, would be of sufficient severity.  If we do find a medically severe combination of impairments, the combined impact of the impairments will be considered throughout the disability determination process.  If we do not find that you have a medically severe combination of impairments, we will determine that you are not disabled.

20 C.F.R. § 404.1523; *see also Loza*, 219 F.3d at 393.  The medical findings of the combined impairments are compared to the listed impairment most similar to the claimant's most severe impairment.  *See Zebley*, 493 U.S. at 531.

The claimant has the burden to prove at step three that [her] impairment or combination of impairments matches or is equivalent to a listed impairment.  *See id.* at 530-31; *Selders*, 914 F.2d at 619.  The listings describe a variety of physical and mental illnesses and abnormalities, most of which are categorized by the body system they affect.  *See Zebley*, 493 U.S. at 529-30.  Individual impairments are defined in terms of several specific medical signs, symptoms, or laboratory test results.  *See id.* at 530.  For a claimant to demonstrate that her disorder matches an Appendix 1 listing, it must meet *all* of the specified medical criteria.  *See id.*  An impairment that manifests only some of the specified criteria, no matter how severe, does not qualify.  *See id.*

For a claimant to qualify for benefits by showing that [her] unlisted impairment, or combination of impairments, is equivalent to a listed impairment, [she] must present medical findings equal in severity to *all* the criteria for the one most similar listed impairment.  *See id.* at 531 (citing 20 C.F.R. § 416.926(a)).  A claimant's disability is equivalent to a listed impairment if the medical findings are at least equal in severity and duration to the listed findings.  *See* 20 C.F.R. § 404.1526(a).  The applicable regulation further provides:

(1)(I)   If you have an impairment that is described in the Listing of Impairments in Appendix 1 of Subpart P of this chapter, but—

10

(A)    You do not exhibit one or more of the medical findings specified in the particular listing, or

(B)    You exhibit all of the medical findings, but one or more of the findings is not as severe as specified in the listing;

(ii)    We will nevertheless find that your impairment is medically equivalent to that listing if you have other medical findings related to your impairment that are at least of equal medical significance.

20 C.F.R. § 404.1526(a).   Nonetheless, "[a] claimant cannot qualify for benefits under the 'equivalence' step by showing that the overall functional impact of [her] unlisted impairment or combination of impairments is as severe as that of a listed impairment." *Zebley*, 493 U.S. at 531. Ultimately, the question of equivalence is an issue reserved for the Commissioner. *See Spellman v. Shalala*, 1 F.3d 357, 364 (5th Cir. 1993).

A review of the medical records submitted in connection with Davis' administrative hearing revealed that in October 2000, while Davis was working at METRO as a shop cleaner, a co-worker of Davis' threatened to kill her after attempting to run her over with a bus.  (R. 159).  She remained off work, seeking psychiatric treatment for depression, anxiety, and PTSD, until, approximately, February 2003.  (R. 125-163).

Davis returned to work at METRO in February 2003, and, after being back approximately a week, Davis reportedly was injured again on February 19, 2003.  (R. 165-166).  Allegedly, while on break, Davis sat in a chair with rollers and the chair slipped out from under her causing her to fall to the ground and striking her right hip, lower back, right shoulder, and neck.  (R. 165-166, 185). Davis claims that her supervisors did not take her injury seriously and that her husband took her for

treatment at St. Luke's Emergency Room, where she allegedly was prescribed muscle relaxers. (R. 166).

On February 19, 2003, Davis visited a chiropractor, Mary Lou Mausolf, D.C. ("Mausolf"), complaining of pain on her right side of her neck in to her upper extremities and right medial scapula border.  (R. 215-216).   According to Mausolf, Davis had "cervical disc syndrome, cervical radiculitis, lumbar disc syndrome, lumbar radiculitis, right shoulder IDS, and MPS."  (R. 215). Mausolf recommended that Davis continue with therapy to consist of ultrasound, electrical stimulation and myofascial release. (R. 216).  X-rays on February 24, 2003, of Davis' shoulder and cervical spine revealed no abnormalities.  (R. 378-379).  Another view (*i.e.*, a "swimmer's view"), however, was recommended to obtain full results.  (R. 379).

On April 14, 2003, Davis had an MRI of her right shoulder that revealed moderate degenerative proliferative changes at the AC joint as well as evidence of tendinosis.  (R. 225).  An MRI on Davis's lumbar spine showed no evidence of spondylolisthesis, but there was evidence of disc bulge at the L4-5 and L5-S1 levels.  (R. 224).

On June 25, 2003, an MRI of Davis cervical spine revealed no spondylolisthesis; however, at the C5-6 and C6-7 discal protrusion/herniation was observed.  (R. 222).

On July 26, 2003, Ed Lewis, M.D. ("Dr. Lewis") performed a nerve conduction study on Davis' upper and lower extremities.  (R. 220-221).  Dr. Lewis reported that the study revealed some pathologic findings that are suggestive of right L5/S1 and C5/C6 nerve root irritation.  (R. 220-221).

On September 3, 2003, an MRI of Davis's right hip was unremarkable.  (R. 219).  An MRI of Davis' lumbar spine demonstrated no evidence of spondylolisthesis.  (R. 218).  At the L4-5 levels, a broad posterior annular disc bulge was observed pressing against the anterior thecal sac.  (R. 218).

12

Also, at the L5-S1 level there was a broad posterocentral discal protrusion/herniation found pressing against the anterior thecal sac.  (R. 218).

On October 20, 2003, Davis visited K. Bobby Pervez, M.D. ("Dr. Pervez"), complaining of pain in her lower back, neck, and shoulder area.  (R. 217).  Dr. Pervez noted that insurance had denied surgery of her cervical spine.  (R. 217).  Dr. Pervez noted that Davis had "no undesirable effects from the [pain] medication." (R. 217).  Dr. Pervez refilled her pain medications and advised Davis to continue to do rehabilitation.  (R. 217).

On October 23, 2003, Rezik A Saqer, M.D. ("Dr. Saqer") performed a percutaneous needle localization of the sacral epidural space, a lumbosacral epidural gram, and a lumbar epidural steroid injection at L5-S1.  (R. 199-200).

In a letter to Metropolitan Transit Insurance, dated November 18, 2003, William R. Francis, Jr., M.D. ("Dr. Francis"), an orthopedist, noted that he had been treating Davis for her back, shoulder, and neck pains since September 2003, and that she had not done well with minimally invasive procedures (*e.g.*, epidural injections and periodic blocks), as the injections has produced uncontrollable nausea.  (R. 185-186).  Dr. Francis recommended that simultaneous surgeries of anterior cervical decompression and fusion with plating (neck surgery) as well as a diskectomy at L4-5 (back surgery) be performed under one anesthesia.  (R. 186).   The letter, however, appears to be incomplete, as it is not signed.  (R. 186).

In separate letters to Metropolitan Transit Insurance and Work Link, dated December 2, 2003, Dr. Francis detailed the objective findings that substantiated his request for Davis to receive cervical fusion and a right-sided L4-5 decompression.  (R. 194-196).

On February 11, 2004, at the request of METRO's workers' compensation division, Davis underwent an independent psychological evaluation with Francisco I. Perez, Ph.D. ("Dr. Perez"). (R. 165-168).  Davis advised Dr. Perez that she was hurting and in constant pain and that "[t]he lawyers for Metro claim that all of this is in my head."  (R. 166).  She further advised Dr. Perez that she had "been trying to prevent surgery."  (R. 166).  At that time, Davis was taking no prescription medications, but, instead, over the counter Aleve.  (R. 167).  With respect to Davis' allegations of pain, Dr. Perez reported:

> Observed behaviors don't agree and there is a strong component of symptom magnification.  She claims that the pain remains very high all the time.  Even though she occasionally engaged in pain behaviors, she does not appear to be in a great deal of discomfort.

(R. 167).   Dr. Perez further noted:

> She completed the Minnesota Multiphasic Personality Inventory-2.  She produced a profile of questionable validity because she is unwilling to disclose personal information.  The profile may be indicative of conscious distortion to present herself in a favorable light.

> The profile indicates a pattern of chronic psychological maladjustment.  There are indications of manipulative behavior.  She may use physical symptoms to manipulate others and to obtain secondary gains.  She sees herself as being quite disabled.  Symptom magnification is quite prominent.  She reports vague symptoms which may not have a clear organic basis.  Symptomatic treatment tends to reinforce disability behaviors.

> * * *

> Individual with MMPI-2 profile are quite difficult to be treated medically since she will complain of more symptoms than objectively exist.  Symptomatic treatment tends to reinforce disability behaviors.  The best management in cases like this is to treat objective findings as opposed to subjective complaints.

> She also completed the Battery for Health Improvement.  She produced a profile that reflects careless responding.  There are significant indications of job dissatisfaction and doctor dissatisfaction contrary to the fact that she relates that she likes her job.  Inconsistent responding I quite prominent.  Contrary to her responses on the MMPI-

2, she endorsed many items that reflect endorsement of the present symptomatology. Again, inconsistent responding is noted, and this is most likely related to motivational factors.

Based on my assessment of Ms. Davis, it is my opinion that she is highly manipulative and that she is engaging in symptom magnification. This psychological presentation needs to be interpreted in the context of her medical findings.  It is my opinion that she is reporting symptoms to obtain secondary gains.  Individuals with this profile tend not to respond to traditional medical treatment since the primary motivation is psychological and not physical.  The driving motivation in this case, in my opinion, is secondary gain.

(R. 167).

On February 28, 2004, at the request of Texas Workers Compensation Commission, Davis visited Scott T. Stoll, D.O. ("Dr. Stoll"), for a designated doctor evaluation.  (R. 174-183).  Dr. Stoll opined that Davis was fit to return to work with restrictions.  (R. 179).  According to Dr. Stoll, Davis had reached maximum medical improvement ("MMI"), and he assigned her a 10% whole person impairment rating.  (R. 179).

On March 15, 2004, Davis visited Mausolf for treatment; however, her goals and a treatment plan were "deferred."  (R. 214).  An additional notation recommended a referral for a mental health evaluation.  (R. 214).  On March 22, 2004, Davis visited Mausolf for a follow-up evaluation. (R. 211-212).  Mausolf disagreed with Dr. Stoll's assessment of MMI and impairment rating. (R. 212).  Mausolf noted that Dr. Francis previously had recommended that Davis undergo surgery, but the surgery had been denied by insurance on more than one occasion.  (R. 212).  Mausolf opined that this prolonged her recovery and achieving MMI.  (R. 212).

On April 22, 2004, Davis visited Mausolf for a follow-up appointment.  (R. 208-209).  Davis continued to complain of neck and back pain as well as numbness and tingling in her right hand.

(R. 208).  At that time, Davis presented to the office using a cane.  (R. 208).  Mausolf opined that Davis was getting progressively worse.  (R. 208).

In a letter dated May 27, 2004, to Metropolitan Transit Insurance, Dr. Francis noted that Davis continued to complain of neck and back pain.  (R. 191-192).  Dr. Francis opined that Davis had L5 radiculopathy, secondary to a diskogenic herniation at L4-L5 as well as C6 radiculopathy from a herniated disk at the C5-C6 and C6-C7.  (R. 191).  Dr. Francis reiterated that Davis was a good surgical candidate, and that she should be given the opportunity to restore her function to be able to return to the work force.  (R. 192).

On June 1, 2004, Davis visited a podiatrist, Esther Jonas, D.P.M. ("Dr. Jonas"), complaining of a painful right fifth toe.  (R. 394).  Dr. Jonas' impression was that Davis had "hammertoe," with a painful lesion.  (R. 394).  Dr. Jonas debrided the lesion.  (R. 394).  She discussed with Davis surgical correction.  (R. 394).

In a letter dated July 30, 2004, to Metropolitan Transit Insurance, Dr. Francis noted that Davis had consistently complained of the same pattern of pain as a result of her injury.  (R. 189). According to Dr. Francis, Davis' pain corresponds exactly to nerve root dermatomal pattern and a true radiculopathy.  (R. 189).  Dr. Francis reported that objective, clinical evidence substantiated Davis' herniated disks in her neck at C5-C6 and at C6-C7 as well as L5 radiculopathy secondary to diskogenic herniation at L4-L5.  (R. 189).  He further noted that Davis has made no attempt to avoid any treatment recommendations and had carried out all of the treatments requested.  (R. 189).

In a letter to Metropolitan Transit Insurance, dated August 30, 2004, Dr. Francis noted that he had received a second denial of appeals for surgery on Davis.  (R. 187).  Dr. Francis opined that he had "been rendered ineffective in being able to treat this lady for her problems."  (R. 187).  Dr.

Francis reiterated that, in his opinion, Davis needed surgery on both her neck and her back to allow her to be more functional and capable of resuming work. (R. 187). Dr. Francis reported that "in view of the fact that I am unable to provide the appropriate services I feel necessary, I am releasing Ms. Davis from my care, at her request." (R. 187). He further noted that Davis wanted to seek opinions and treatment from an alternative physician so that she could get on with her life and become more functional in her day-to-day activities. (R. 187).

On September 15, 2004, Davis visited Warren B. Dailey, M.D., ("Dr. Dailey"), complaining of neck, right shoulder, low back, and right hip pain. (R. 205-206). At that time, Davis was not taking any prescription medication; instead, she only reported taking over-the-counter Bayer Extra Strength for pain. (R. 205). Dr. Dailey reviewed her cervical and lumbar MRI's, noting nerve root irritation. (R. 205). Dr. Dailey noted that he disagreed with Dr. Stoll's MMI and impairment rating. (R. 206). According to Dr. Dailey, Davis had failed conservative treatment and should be referred to a neurological surgeon, John B. Berry, M.D. ("Dr. Berry"), for an evaluation. (R. 205-206). Dr. Dailey prescribed Davis medication (*i.e.*, Tolectin) for her pain. (R. 205, 207).

In a final letter to Metropolitan Transit Insurance, dated September 24, 2004, Dr. Francis reiterated Davis' need for surgery, and reported that Davis' lower back had spinal stenosis at a degenerative level. (R. 185). Dr. Francis noted that she should be tried for epidural injections at L4-5 on the right side continuing with a more proactive exercise program for her lower back. (R. 185). Dr. Francis reported that he had prescribed Davis Celebrex and Flexeril and provided her a soft corset for back support. (R. 185). The letter, however, appears incomplete, as it is not signed. (R. 185).

On October 13, 2004, Davis visited neurological surgeon, Dr. Berry, for an examination. (R. 287-292).  Dr. Berry's impression was that Davis had nonspecific radiculopathy.  (R. 288).  He noted that MRI changes, disc herniation and degenerative changes at C5-6 were consistent with neck and right shoulder complaints and the disc at L4-5 on the right was consistent with her herniated disc at L4-5, which correlated with her right back and leg complaints.  (R. 288).  Dr. Berry recommended that Davis proceed with lumbar and cervical myelogram and a CAT scan.  (R. 288).

On December 2, 2004, Davis visited with Nan Jiang, M.D. ("Dr. Jiang"), complaining of neck pain, low back pain, and right shoulder and right hip pain.  (R. 204).  Davis advised Dr. Jiang that a myelogram had been recommended, but denied by insurance.  (R. 204).  Dr. Jiang noted pain on palpation of the cervical paraspinal musculature.  (R. 204).  It was further noted that Davis had a reduced range of motion, and her gait was guarded.  (R. 204).  Dr. Jiang's recommendation was to request again the myelogram.  (R. 204).

On February 3, 2005, Davis revisited Dr. Jiang, complaining to neck pain and low back pain. (R. 203).  Dr. Jiang noted that the cervical and lumbar myelogram requests had been denied. (R. 203).  Davis was diagnosed with cervical disc syndrome; cervical radiculitis; lumbar disc syndrome; lumbar radiculitis; right hip internal derangement syndrome; and myofascial pain syndrome.  (R. 203-204).

Because Davis felt as though she had "not gotten any results from [her] doctor [Dr. Dailey]," Davis completed a request to change doctors to Texas Workers' Compensation Commission. (R. 296).  On February 22, 2005, Davis visited Howard Grant, M.D. ("Dr. Grant"), for treatment of her lowers back, neck, shoulder and left hip.  (R. 298-299).  Although he had not received her

medical records, Dr. Grant diagnosed Davis with "lumbarsacral sprain, cervical sprain, left hip, and shoulders," and recommended physical therapy three times a week.  (R. 298).

On March 3, 2005,  Dr. Berry wrote a letter, noting that Davis had neck and back pains that were corroborated by MRIs.  (R. 286).  According to Dr. Berry, Davis was unable to have surgery at that time; therefore, Dr. Berry opined that Davis was unable to work.  (R. 286).

On April 19, 2005, Davis revisited Dr. Jonas, complaining of a painful spur on her right, fifth toe.  (R. 408).  Dr. Jonas sent Davis for x-rays and discussed surgical correction consisting of arthroplasty on her fifth toe.  (R. 408).   An x-ray of Davis' right foot revealed a healed fracture present in the distal fifth metatarsal as well as degenerative changes in the first through third tarsometatarsal joint spaces.  (R. 409).

On May 17, 2005, Eun Kwun, M.D. ("Dr. Kwun"), prepared a physical residual functional capacity assessment of Davis.  (R. 301-308).  In his assessment, Dr. Kwun found that Davis could lift 20 pounds occasionally and 10 pounds frequently; she could stand, sit and/or walk about 6 hours in an 8-hour workday; and had no limitations regarding pushing or pulling.  (R. 302).  As for postural limitations, Dr. Kwun found that she should never climb ramps, stairs, ladders, ropes, or scaffolds. (R. 303).  Davis had no manipulative, visual, communicative, or environmental limitations.  (R. 304-305).  According to Dr. Kwun, Davis' alleged limitations are not wholly credible although health related problems exist.  (R. 306).  In late-May 2005, Dr. Jonas performed arthroplasty on Davis' right foot, fifth toe.  (R. 410-411).   Dr. Jonas reported that Davis was doing well after the surgery. (R. 410).

On July 6, 2005, Stephen I. Esses, M.D. ("Dr. Esses"), an orthopedic surgeon, completed a physical residual functional capacity questionnaire for Davis.  (R. 317-320).  Dr. Esses noted his

diagnosis of Davis' herniated disc, and reported Davis' prognosis as "guarded." (R. 317). Dr. Esses indicated that Davis' impairment had lasted or could be expected to last at least twelve months, and that Davis was not a malingerer. (R. 317). According to Dr. Esses, Davis' impairments frequently interfered with her attention and concentration. (R. 318). Dr. Esses opined that Davis was incapable of even a low stress job. (R. 318). Dr. Esses reported that Davis could walk one block, sit or stand for 10 minutes. (R. 318). He further noted that Davis must use a cane, and that she could occasionally lift and/or carry less than 10 pounds, could never lift and/or carry more than 10 pounds, and could never twist, stoop/bend, crouch/squat, climb ladders, or climb stairs. (R. 319-320). Dr. Esses indicated that Davis would miss more than four days a month due to her alleged impairments. (R. 320).

On May 19, 2005, Davis has an arthroplasty done by Esther Jonas, DPM, ("Dr. Jonas"). (R. 410). On May 26, 2005, and June 2, 2005, Davis had a post arthroplasty follow up with Dr. Jonas and her fifth toe on the right foot was doing well and healing uneventfully. (R. 410-411).

On August 11, 2005, Walter Buell, M.D. ("Dr. Buell"), prepared a physical residual functional capacity assessment of Davis. (R. 309-316). Dr. Buell made the same assessments as Dr. Kwun, except he found no postural limitations. (R. 310-311). Dr. Bruell found that Davis' allegations were not supported by the medical evidence of record. (R. 314).

On November 18, 2006, an MRI of Davis' lumbar spine revealed at L4-5 small right paracentral focal disc extrusion, and at L5-S1 a small left extra-foraminal disc protrusion. (R. 420, 423). An MRI of Davis' cervical spine revealed C5-6 moderate broad based disc protrusion with an associated annular tear, and at C3-4 and C4-5 mild broad based disc bulges. (R. 421-422).

On December 7, 2006, Davis visited K. Moran, M.D. ("Dr. Moran"), complaining of right neck, shoulder, and arm pain, and right leg pain.  (R. 425).  Dr. Moran discussed treatment options, including epidural steroid injections of her cervical and lumbar spine.  (R. 425).

On January 31, 2007, Davis met with internal medicine physician, Yasodara Udayamurthy, M.D. ("Dr. Udayamurthy"), for a pre-operation physical.  (R. 427).  Dr. Udayamurthy noted that Davis was scheduled for cervical fusion (*i.e.*, neck surgery) with Dr. Moran on February 9, 2007.  (R. 427-429).  Dr. Udayamurthy advised Davis that her leg and back pain may not improve with neck surgery, as she has lumbar disc disease also.  (R. 430).  On February 6, 2007, Dr. Udayamurthy noted that Davis needed to reschedule her neck surgery due to illness.  (R. 434).

On February 22, 2007, Davis revisited Dr. Esses, complaining of neck and low back pain.  (R. 436).  Dr. Esses reported that examination of Davis continued to show marked limitations in her range of motion of her cervical spine.  (R. 436-439).  Her lower back also showed pain with straight-leg raising on the right side. (R. 436).

On March 1, 2007, Davis was recommended as an excellent candidate for a right-sided L4-5 discectomy by Dr. Esses, due to a disc herniation which compressed the nerve and thecal sac.  (R. 440).  On March 30, 2007, Davis underwent a right-sided L4-5 discectomy, at which time a very large disc herniation was identified.  (R. 441).  Dr. Esses noted in post-surgical follow-up appointments that Davis was doing extremely well and, two weeks from surgery, her leg pain had completely resolved and she had no pain with straight-leg raising.  (R. 444-445).  Dr. Esses reported that Davis had good strength, and her reflexes were normal.  (R. 444).  Dr. Esses opined that Davis would not require formal physical therapy.  (R. 444).

21

"[O]rdinarily the opinions, diagnoses, and medical evidence of a treating physician who is familiar with the claimant's injuries, treatments, and responses should be accorded considerable weight in determining disability." *Greenspan*, 38 F.3d at 237; *accord Myers*, 238 F.3d at 621; *Loza*, 219 F.3d at 395; *Scott v. Heckler*, 770 F.2d 482, 485 (5th Cir. 1985).   The opinion of a specialist generally is accorded greater weight *than* that of a non-specialist.   *See Newton*, 209 F.3d at 455; *Paul v. Shalala*, 29 F.3d 208, 211 (5th Cir. 1994), *overruled on other grounds by Sims v. Apfel*, 530 U.S. 103, 108 (2000).   Medical opinions are given deference, however, only if those opinions are shown to be more than conclusory and supported by clinical and laboratory findings.   *See Scott*, 770 F.2d at 485.   Moreover, a treating physician's opinions are far from conclusive and may be assigned little or no weight when good cause is shown.   *See Myers*, 238 F.3d at 621; *Loza*, 219 F.3d at 395; *Greenspan*, 38 F.3d at 237.

Good cause may permit an ALJ to discount the weight of a treating physician's opinion in favor of other experts when the treating physician's evidence is conclusory, unsupported by medically acceptable clinical, laboratory, or diagnostic techniques, or is otherwise unsupported by the evidence.   *See Myers*, 238 F.3d at 621; *Newton*, 209 F.3d at 456; *see also Brown*, 192 F.3d at 500; *Greenspan*, 38 F.3d at 237; *Paul*, 29 F.3d at 211.   It is well settled that even though the opinion and diagnosis of a treating physician should be afforded considerable weight in determining disability, the ALJ has sole responsibility for determining a claimant's disability status.   *See Paul*, 29 F.3d at 211; *accord Myers*, 238 F.3d at 621; *Newton*, 209 F.3d at 455.

In the case at bar, Davis contends that the ALJ erred by not giving controlling weight to the opinions of her treating physicians.   Davis maintains that the ALJ failed to weigh all of the evidence pursuant to 20 C.F.R. § 404.1527(d)(2) before disregarding the opinions of her treating

physicians.  The Court agrees.  The objective medical evidence demonstrates Davis' back and neck had bulging and/or herniated discs dating back to 2003.  Indeed, MRI's of Davis' lumbar spine consistently revealed evidence of a disc bulge at the L4-5 and L5-S1 levels.  (R. 218, 224, 420, 423). Similarly, MRI's of Davis' cervical spine showed disc protrusion/herniation at C5-6 and C6-7 levels. (R. 222, 421-422).   A nerve conduction study also revealed pathological findings that were suggestive of right L5-S1 and C5-6 nerve root irritation.  (R. 220-221).

Surgery was recommended by Davis' treating physicians; however, it was denied by her insurance carrier on several occasions.  In fact, commencing in fall 2003, Dr. Francis recommended that Davis undergo an anterior cervical decompression and fusion (neck surgery) with plating due to Davis' herniated discs at both C5-6 and 6-7 as well as a diskectomy at L4-5 (back surgery).  (R. 185, 186, 187, 189, 191-192, 194-195, 196-197).  It was further reported that Davis' lower back had spinal stenosis at a degenerative level.  (R. 185, 197).

Although the ALJ relies heavily on Dr. Stoll's contention that Davis displayed symptom magnification and that Davis could return to work with restrictions, this opinion was not shared by several of Davis's doctors, including specialists in their field of medicine.  (R. 32).  Indeed, Dr. Dailey and Davis' chiropractor, Mausolf, disagreed with Dr. Stoll's conclusion that Davis had reached MMI and her impairment rating was only 10%.  (R. 179, 206, 212).  Drs. Dailey and Jiang recommended that Davis consult with a surgeon.  Both Davis' neurosurgeon, Dr. Berry, and her orthopedic surgeon, Dr. Esses, reported that Davis was unable to work due to her condition.  (R. 286, 318).  Specifically, in March 2005, Dr. Berry noted that Davis was unable to have surgery at that time; therefore, Davis was unable to work.  (R. 286).  Moreover, in July 2005, Dr. Esses, reported Davis was unable to handle even a low stress job.  (R. 318).  Contrary to the ALJ's decision, there

is ample objective, medical evidence demonstrating that Davis' neck and back impairments were severe.      T

The ALJ's disregard for the opinions of Davis' treating physicians without weighing all the evidence under the criteria set forth in the regulations, is not a viable option under *Newton.* Consequently, given the ALJ's incomplete analysis and failure to accord any deference to the expert medical opinions of Davis' treating physician without first seeking clarification, the ALJ's finding of no disability is not supported by substantial evidence.  Pursuant to *Newton* and *Myers*, this case must be remanded to the Commissioner for a proper evaluation of the medical evidence, including the opinions of Drs. Francis, Dailey, Jiang, Berry, Esses, and, if appropriate, to allow for an additional consultative examination.  Davis correctly points out that the medical evidence had been reviewed by SSA doctors between 22 and 25 months *before* the administrative hearing took place.  It appears that, instead of seeking an updated medical expert opinion, the ALJ relied upon his own interpretation of the evidence.  In addition to an updated medical expert opinion, it may be of benefit to the ALJ to have medical experts, specializing in neurology and orthopedics, present at any new administrative hearing to properly review the medical evidence.

### 2.     *Subjective Complaints*

The law requires the ALJ to make affirmative findings regarding claimant's subjective complaints.  *See Falco v. Shalala*, 27 F.3d 160, 163 (5th Cir. 1994) (citing *Sharlow v. Schweiker*, 655 F.2d 645, 648-49 (5th Cir. 1981)).  When a claimant alleges disability resulting from pain, [she] must establish a medically determinable impairment that is capable of producing disabling pain.  *See Ripley v. Charter*, 67 F.3d 552, 556 (5th Cir. 1995) (citing 20 C.F.R. § 404.1529).  Once a medical impairment is established, the subjective complaints of pain must be considered along with the

24

medical evidence in determining the individual's work capacity.  *See id.*  It is well settled that an ALJ's credibility findings on a claimant's subjective complaints are entitled to deference.  *See Chambliss v. Massanari*, 269 F.3d 520, 522 (5th Cir. 2001); *Scott v. Shalala*, 30 F.3d 33, 35 n.2 (5th Cir. 1994); *Falco*, 27 F.3d at 164; *Wren*, 925 F.2d at 128.  The Fifth Circuit recognizes that "the ALJ is best positioned" to make these determinations because of the opportunity to observe the claimant first-hand.  *See Falco*, 27 F.3d at 164 & n.18.  Moreover, "[t]he Act, regulations and case law mandate that the Secretary require that subjective complaints be corroborated, at least in part, by objective medical findings."  *Harrell v. Bowen*, 862 F.2d 471, 481 (5th Cir. 1988) (citing 42 U.S.C. § 423(d)(5)(A); 20 C.F.R. § 404.1529; *Owens v. Heckler*, 770 F.2d 1276, 1281-82 (5th Cir. 1985)); *accord Chambliss*, 269 F.3d at 522 (citing *Houston v. Sullivan*, 895 F.2d 1012, 1016 (5th Cir. 1989)); *Hampton v. Bowen*, 785 F.2d 1308, 1309 (5th Cir. 1986).

As a matter of law, the mere fact that working may cause a claimant pain or discomfort does not mandate a finding of disability.  *See Hames*, 707 F.2d at 166; *Epps v. Harris*, 624 F.2d 1267, 1274 (5th Cir. 1980); *accord Brown v. Bowen*, 794 F.2d 703, 707 (D.C. Cir. 1986).  Additionally, the mere existence of pain does not automatically bring a finding of disability.  *Harper v. Sullivan*, 887 F.2d 92, 96 (5th Cir. 1989); *Owens*, 770 F.2d at 1281.  It must be determined whether substantial evidence indicates an applicant can work despite being in pain or discomfort.  *See Chambliss*, 269 F.3d at 522; *Johnson v. Heckler*, 767 F.2d 180, 182 (5th Cir. 1985).

For pain to rise to the level of disabling, that pain must be "constant, unremitting, and wholly unresponsive to therapeutic treatment."  *Chambliss*, 269 F.3d at 522; *Falco*, 27 F.3d at 163; *Wren*, 925 F.2d at 128.  The decision arising from the ALJ's discretion to determine whether pain is disabling is entitled to considerable deference.  *See Chambliss*, 269 F.3d at 522; *Wren*, 925 F.2d at

128; *James*, 793 F.2d at 706.  However, an ALJ may discount subjective complaints of pain as inconsistent with other evidence in the record.  *Dunbar v. Barnhart*, 330 F.3d 670, 672 (5th Cir. 2003) (citing *Wren*, 925 F.2d at 128 (citation omitted)).

At the administrative hearing, Davis testified regarding her complaints of pain.  (R. 462-485). The ALJ, however, determined that Davis' subjective complaints, regarding her pain and functional limitations, were not totally credible.  (R. 32-33).  Contrary to the ALJ's finding, the medical record of evidence is replete with documentation of Davis' alleged pain.   Indeed, MRI's showing a disc bulge at the L4-5 and L5-S1 levels and disc protrusion/herniation at C5-6 and C6-7 levels provide objective medical evidence corroborating Davis' allegations of pain.  (R. 218, 222, 224, 420, 421-422, 423).  Indeed, treatment notes from a multitude of doctors, including Drs. Francis, Dailey, Jiang, Berry, Esses, Jonas, Moran, Pervez, Udayamurthy, document Davis' pain over the years.  The notes also indicated that conservative treatment was unsuccessful.  (R. 186, 189, 205-206).  Taking into consideration the breadth of the record documenting Davis' pain, the notations by Dr. Francis that Davis' pain corresponds exactly to the nerve root dermatomal pattern and a true radiculopathy, and the clinical evidence (*e.g.*, MRI's and nerve conduction study), the ALJ's conclusion that Davis' alleged limitations were not entirely credible is not supported by substantial evidence.

### 3. *Residual Functional Capacity*

Under the Act, a person is considered disabled:

> only if [her] physical or mental impairment or impairments are of such severity that [her] is not only unable to do [her] previous work but cannot, considering [her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which [she] lives, or whether a specific job vacancy exists for [her], or whether [she] would be hired if [she] applied for work.

42 U.S.C. § 423(d)(2)(A).   The Commissioner bears the burden of proving that a claimant's functional capacity, age, education, and work experience allow her to perform work in the national economy.   *See Brown v. Yuckert*, 482 U.S. 137, 146 n.5 (1987); *see also Masterson*, 309 F.3d at 272; *Watson*, 288 F.3d at 216; *Myers*, 238 F.3d at 619; *Greenspan*, 38 F.3d at 236.   If the Commissioner fulfills this burden by pointing out potential alternative employment, the claimant, in order to prevail, must prove that [she] cannot perform the alternate work suggested.   *See Masterson*, 309 F.3d at 272; *Boyd*, 239 F.3d at 705; *Shave*, 238 F.3d at 594; *Carey v. Apfel*, 230 F.3d 131, 135 (5th Cir. 2000).

To determine whether a claimant can return to a former job, the claimant's "residual functional capacity" must be assessed.   *See Moore v. Sullivan*, 895 F.2d 1065, 1068 (5th Cir. 1990); *see also* 20 C.F.R. § 404.1545.   This term of art merely represents an individual's ability to perform activities despite the limitations imposed by an impairment.   *See Villa v. Sullivan*, 895 F.2d 1019, 1023 (5th Cir. 1990); *see also* 20 C.F.R. § 404.1545.   Residual functional capacity combines a medical assessment with the descriptions by physicians, the claimant or others of any limitations on the claimant's ability to work.   *See Elzy v. Railroad Retirement Bd.*, 782 F.2d 1223, 1225 (5th Cir. 1986); *see also* 20 C.F.R. § 404.1545.   When a claimant's residual functional capacity is not sufficient to permit [her] to continue [her] former work, then [her] age, education, and work experience must be considered in evaluating whether [she] is capable of performing any other work.   *See Boyd*, 239 F.3d at 705; 20 C.F.R. § 404.1520.   The testimony of a vocational expert is valuable in this regard, as "she is familiar with the specific requirements of a particular occupation, including working conditions and the attributes and skills needed." *Fields v. Bowen*,

805 F.2d 1168, 1170 (5th Cir. 1986); *accord Carey*, 230 F.3d at 145; *see also Vaughan v. Shalala*, 58 F.3d 129, 132 (5th Cir. 1995).

In evaluating a claimant's residual functional capacity, the Fifth Circuit has looked to SSA rulings ("SSR"). *See Myers*, 238 F.3d at 620. The Social Security Administration's rulings are not binding on this court, but they may be consulted when the statute at issue provides little guidance. *See id.* In *Myers*, the Fifth Circuit relied on SSRs addressing residual functional capacity and exertional capacity. *See id.* In that case, the court explained:

> First, SSR 96-8p provides that a residual functional capacity (RFC) is an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis. A regular and continuing basis means 8 hours a day, for 5 days a week, or an equivalent work schedule. The RFC assessment is a function-by-function assessment based upon all of the relevant evidence of an individual's ability to do work-related activities. However, without the initial function-by-function assessment of the individual's physical and mental capacities, it may not be possible to determine whether the individual is able to do past relevant work. . . . RFC involves both exertional and non-exertional factors. Exertional capacity involves seven strength demands: sitting, standing, walking, lifting, carrying, pushing, and pulling. Each function must be considered separately. In assessing RFC, the adjudicator must discuss the individual's ability to perform sustained work activities in an ordinary work setting on a regular and continuing basis. . . . The RFC assessment must include a resolution of any inconsistencies in the evidence.

*Id.* (internal citations omitted); *see* 61 Fed. Reg. 34474-01 (July 2, 1996). The court further commented:

> Second, SSR 96-9p also provides that initially, the RFC assessment is a function-by-function assessment based upon all of the relevant evidence of an individual's ability to perform work-related activities.

*Id.* (internal citations omitted); *see* 61 Fed. Reg. 34478 (July 2, 1996). The court also noted that SSR 96-9p defines "exertional capacity" as the aforementioned seven strength demands and requires that the individual's capacity to do them on a regular continuing basis be stated. *See id.*

To determine that an claimant can do a given type of work, the ALJ must find that the claimant can meet the job's exertional requirements on a sustained basis.  *See Carter v. Heckler*, 712 F.2d 137, 142 (5th Cir. 1983) (citing *Dubose v. Matthews*, 545 F.2d 975, 977-78 (5th Cir. 1977)).

In this case, the ALJ, relying on the record evidence and the testimony of Davis and VE King, determined that Davis retained the residual functional capacity to lift and carry 20 pounds occasionally and 10 pounds frequently, sit for 6 to 8 hours in a work day, stand or walk for 6 to 8 hours in a work day.  (R. 30).  The ALJ, however, also concluded that Davis could not climb ladders, ropes, scaffolds, or stairs.  (R. 30).   The ALJ's decision is not supported by substantial evidence.  *See* 20 C.F.R. § 404.1512.  As set forth above, the ALJ improperly discounted the opinions of Davis' treating physicians regarding her RFC.  The ALJ rejected the opinions of Davis' treating physician without sufficient rationale and/or explanation. Because the VE' s testimony was based on an erroneous formulation of Davis'  RFC, the ALJ' s decision that Davis could perform her past relevant work is not supported by substantial evidence.

**III.**   ***Conclusion***

Accordingly, it is therefore

**ORDERED** that Davis's Motion for Summary Judgment (Docket Entry No. 15) is **GRANTED**.  It is further

**ORDERED** that the Commissioner's Motion for Summary Judgment (Docket Entry No. 16) is **DENIED**.  It is finally

**ORDERED** that the Commissioner's decision denying Davis's disability benefits is **REVERSED** and **REMANDED**, pursuant to "sentence four" of Section 205(g) of the Social Security Act, 42 U.S.C. § 405(g), to the Commissioner for a new hearing to properly evaluate the

opinions of Davis' treating physicians regarding limitations related to Davis' back and neck impairments during the relevant time period, to consult with medical experts, if needed, regarding Davis' alleged impairments, to properly consider Davis' level of pain and credibility assessment, and to develop clear testimony from a VE regarding jobs, if any, Davis is capable of performing considering all of her alleged limitations.

**SIGNED** at Houston, Texas on this 29th  day of September, 2009.

Calvin Botley
United States Magistrate Judge